IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHANNON HAYNES

    Plaintiff,

v.

SIG SAUER, INC.

    Defendant.

CIVIL ACTION FILE

NO. 1:20-CV-4218-MHC

## AMENDED COMPLAINT

COMES NOW Plaintiff in the above-styled action and hereby files his Amended Complaint as follows:

1.

Plaintiff Shannon Haynes ("Haynes") is a citizen of the state of Georgia.

2.

Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. Sec. 1332. Plaintiff Haynes is a citizen of the United States and the State of Georgia. Defendant Sig Sauer, Inc. has a principal place of business in New Hampshire. The amount in controversy, exclusive of interest and costs, $75,000.

3.

Venue is proper in this judicial circuit under 28 U.S.C. Sec. 1391(a)(2) as a substantial part of the events or omissions giving rise to the action which occurred in this district.

4.

Defendant Sig Sauer, Inc. (hereinafter "SIG") has been properly served with process in this action.

## **PARTIES**

5.

Haynes is a natural person and resident of the State of Georgia, who suffered severe, permanent physical injury as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

6.

Sig Sauer, Inc. designs and manufactures firearms for military, law enforcement and commercial uses in Georgia, across the United States, and internationally.

7.

Sig Sauer, Inc. markets and sells its products through dealers. Sig

Sauer, Inc. was formerly known as SIGARMS, Inc. and changed its name to SIG SAUER, Inc. in October 2007. The company was founded in 1985 and has its principal place of business in Newington, New Hampshire.

## **ALLEGATIONS**

### 8.

The incident occurred on October 13, 2018 while Haynes was working as a police officer with the City of Riverdale Police Department.

### 9.

As part of his employment with the City of Riverdale Police Department, Haynes was issued a P320 that was manufactured by Sig Sauer, Inc.

### 10.

As Haynes was in the process of holstering his weapon, the firearm discharged shooting him in the leg (hereinafter referred to as the "incident").

### 11.

Prior to the incident, Haynes had not had any issues with the P320 he had

been issued.

## 12.

Prior to the incident, the firearm Haynes had been issued had not been altered in any way by either him or the precinct.

## 13.

At no point did Haynes ever pull the trigger to his firearm.

## 14.

As a result of the injury, Haynes incurred medical expenses in the amount of $49,003.19. The incident has resulted in substantial physical harm and related trauma to Haynes who has received substantial and ongoing treatment to deal with the injury.

## 15.

Years before the incident occurred, through and including the date of the incident and the present day, SIG expressly represented that "[w]e've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



16.

In additional marketing material, under the heading "Striker Safety,"
defendant SIG SAUER further states:  The Striker Safety "[p]revents the
striker from releasing *unless the trigger is pulled."* (emphasis added).

17.

At the same time, SIG SAUER contradictorily stated in the original
owner's manual for the P320, on page 25, that the weapon may fire if dropped
without the trigger being pulled if the chamber is not empty.

18.

It is, however, standard operating procedure for many U.S. law
enforcement agencies, local police departments, and the military, at a
commander's discretion, to carry pistols with a chambered round.

19.

SIG was aware of this fact at the time it designed and manufactured all
its pistols including the P320.

20.

In 2017, after a Connecticut law enforcement agent was shot by a P320

when it fell to the ground from less than three feet, it accordingly removed the warning on page 25 regarding carrying a chambered round, and replaced it with the following language:

 All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices. **Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

21.

SIG had never before represented that mere "'vibration'" could cause the weapon to discharge.

22.

Moreover, it had also expressly represented since its manufacture and distribution into the stream of commerce that the weapon was also drop safe without a safety:



**SAFETY WITHOUT COMPROMISE.**

Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system. Never again will you need to pull the trigger to disassemble your pistol. And, while available as an option, you won't need a tabbed trigger safety for your gun to be drop safe.

FILTER    P320    12 items

23.

SIG's original design and manufacture of the P320 in 2014, or earlier, rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, at the time SIG sold it to Haynes' Department.

24.

Specifically, upon information and belief, the mass and weight of the P320 trigger was far too large and heavy, rendering the weapon susceptible of inertia-based discharges. In addition, it lacked a mechanical disconnect device within the weapon (which has since been added for purchasers who ask SIG to install one), possessed an inadequate sear, and any external safety or tabbed trigger safety.

25.

When SIG shipped the P320s to the City of Riverdale Police Department where Haynes is employed, it knew, or should have known, that the weapon was defective and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and accidental discharges that could occur in the ordinary course of using the weapon.

26.

Before it shipped these weapons, it was aware of accidental discharges if the P320 weapon, and other SIG pistols, many of which pre-dated and post-dated, the sale to the City of Riverdale Police Department.

27.

Upon information and belief, there had been many prior incidents of unintended discharges involving SIG weapons that have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, or while being holstered.

28.

For example, from 2005 to January 2011, the San Francisco Police Department reported 29 accidental discharges (a time when it issued SIG Sauers as its primary sidearm).

29.

In 2008, an officer in Connecticut accidentally discharged his SIG Sauer while holstering it.

30.

In 2011, a security guard in St. Louis dropped his SIG Sauer, unintentionally shooting someone.

31.

In 2012, a New York transit officer accidentally discharged his SIG

Sauer while holstering it.

32.

In 2014, a federal air marshal in New Jersey unintentionally shot himself while handling his SIG Sauer service weapon.

33.

In 2015, a Pennsylvania state trooper and firearms instructor accidentally killed another trooper with his SIG Sauer while conducting safety training.

34.

In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

35.

In 2017, a sheriff's deputy in Michigan accidentally discharged his SIG Sauer, striking a schoolteacher in the neck.

36.

On January 5, 2017, a P320 shot a Stamford SWAT team member

in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG's express representations that the weapon is drop safe, and does not require a safety to be drop safe.

37.

On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

38.

On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

39.

On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ Police Department.

40.

SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership that the problems with the weapon would be fixed, but that "for now," it had to deal with the weapon as currently manufactured and designed.

41.

On August 4, 2017, a Stamford SWAT team member sued SIG in U.S. District Court in Connecticut for an accidental discharge of a commercial version of the P320 which shot him in his knee.

42.

On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies."

43.

The upgrade program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, and an improved sear to prevent accidental discharges.

44.

In October 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

45.

On November 12, 2017, a P320 accidentally discharged in Tyler, Texas.

46.

In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas.

47.

Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to accidental discharges causing injury in both 2016 and 2017.

48.

To date, SIG has never issued a mandatory recall of the P320 for repairs, though it has done so in the past for other of its products.

49.

In an interview in 2013, SIG's Chief Financial Officer, Timothy Scullin, noted that Sig's revenue rose approximately 1,400 percent from 2012 to 2013 and stated that Sig Sauer's Growth has outpaced its industry's growth by ··two or three times."

50.

When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At SIG, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

## NEGLIGENCE
## (FAILURE TO WARN, NEGLIGENT ASSEMBLY OR MANUFACTURE, NEGLIGENT DESIGN)

51.

Haynes readopts and re-alleges all of the preceding paragraphs of this pleading as if fully set forth herein.

52.

At all relevant times, SIG owed Haynes the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon his merely handling the holster in which it was situated before selling the gun and placing it into the stream of commerce.

To the extent SIG did not owe this duty under existing Georgia law, it assumed such a duty by virtue of its past conduct.

53.

At all relevant times, SIG owed Haynes the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon her merely handling the holster in which it was situated, before selling the gun and placing it into the stream of commerce. To the extent the SIG did not owe this duty under existing Georgia law, it assumed such a duty by virtue of its past conduct in recalling other defective weapons from the marketplace.

54.

At all relevant times, SIG owed a duty to unambiguously and adequately warn consumers and/or intended users of the P320, including Haynes, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents pre-dating this

lawsuit, internal testing and research, industry publications and research, and other sources of information to be developed in discovery. To the extent SIG did not owe this duty under existing Georgia law, it assumed such a duty by virtue of its past conduct in recalling other defective weapons from the marketplace.

55.

SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

1.    By failing to use due care in designing and manufacturing the P320's trigger, including but not limited to its mass and weight, so as to prevent accidental discharges;

2.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

3.    By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products, and instead announcing a "voluntary upgrade" of the weapon, which it knew to be defective and prone to accidental discharges based on all available information in SIG's

possession as of August 2017, if not much earlier;

4. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

5. By negligently failing to unambiguously and adequately warn purchasers and end users of the gun, including Haynes, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

6. By failing to discover the defective, hazardous an unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally, e.g., if "'vibrated" in some unspecified fashion, while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

7. By negligently failing to place a warning about how mere "vibration" of the gun could cause it to discharge without a voluntary trigger pull in an adequate manner, which could be easily understood by a

consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

8.    Other negligent acts and omissions to be developed in the course of discovery.

56.

SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

57.

The gun's defective condition was latent and Haynes was not capable of realizing the dangerous condition, and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

58.

SIG's negligence as alleged in this Count directly and proximately caused the October 13, 2018 accidental discharge and Haynes' injuries resulting from the incident.

59.

As a direct and proximate result of the negligence set forth in this Count, Haynes suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred injuries. These injuries are either permanent or continuing in their nature and Haynes will suffer such losses and impairments in the future.

## BREACH OF IMPLIED WARRANTY OF  MERCHANTABILITY

60.

Haynes readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

61.

At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Haynes' injuries.

62.

SIG knew of the ordinary purposes for which the gun was intended and

impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

63.

At all relevant times, Haynes used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG.

64.

SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

1. Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

2. Failing to issue a mandatory recall of the P320 as SIG had

done in the past with other defective products;

3.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

4.    Negligently failing to unambiguously warn purchasers and end users of the gun, including Haynes, of said defective, hazardous and unreasonably dangerous conditions

relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

5.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

6. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of

accidental discharges;

65.

Haynes, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident on October 13, 2018 and Haynes' claimed injuries.

66.

As a direct and proximate result of the breaches set forth in this Count, Haynes suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Haynes will suffer such losses and impairments in the future.

## BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

### 67.

Haynes readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

### 68.

At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Haynes' injuries. Upon information and belief, SIG knew or had reason to know the gun would be situated in holsters that would need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

### 69.

Accordingly, SIG impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time.

70.

At all relevant times, Haynes used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued holster.

71.

SIG breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous and unfit to be removed while in its holster at the time it left SIG's possession by virtue of:

I.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

2.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

3.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

4.    Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Haynes, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

5.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

6.    Negligently failing to place a warning about the danger of mere ·'vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

72.

As a direct and proximate result of the breaches set forth in this Count, Haynes suffered severe physical injury, mental anguish, inconvenience, loss

of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Haynes will suffer such losses and impairments in the future.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### 73.

Haynes readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

### 74.

By its actions, SIG knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled. Yet is presented to the City of Riverdale Police Department including Haynes, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

75.

SIG's conduct created an unreasonable risk of causing the plaintiff emotional distress;

76.

Haynes' emotional distress was foreseeable;

77.

The emotional distress was severe enough that it might result in illness or bodily harm, and in fact did result in severe bodily harm; including severe damage his right leg.

78.

SIG's conduct was the direct and proximate cause of Haynes' distress.

79.

The trigger was not pulled by Haynes, yet the weapon still fired and shot him in the leg.

80.

As a direct and proximate result of the breaches set forth in this Count, Haynes suffered severe physical injury, mental anguish, inconvenience, loss

of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Haynes will suffer such losses and impairments in the future.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### 81.

Haynes readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

### 82.

Upon information and belief, SIG had knowledge of the various defects with the commercial version of the P320 gun more than a year before Haynes in October 2018.

### 83.

Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe

injury to Haynes.

84.

Had SIG acted responsibly and repaired the defects in the P320 before October 2018, Haynes never would have been shot. The round discharged from his weapon easily could have taken his life.

85.

SIG knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the gun instead of a mandatory recall.

86.

SIG's conduct in this matter was self-serving, deceptive, reckless, intolerable and outrageous as described above, such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

87.

SIG's conduct was the direct and proximate cause of Haynes' distress.

## 88.

The emotional distress sustained by Haynes was severe and was accompanied by severe and permanent physical injury.

## 89.

As a direct and proximate result of the breaches set forth in this Count, Haynes suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Haynes will suffer such losses and impairments in the future.

## 90.

As a direct and proximate result of the statutory violations set forth in this Count, Haynes suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either

permanent or continuing in their nature and Haynes will suffer such losses and impairments in the future.

91.

Defendant Sig Sauer is incorporated in the state of Delaware as evidenced by Defendant Sig Sauer's Corporation Page on the New Hampshire Secretary of State's website.

## **PRAYER FOR RELIEF**

**WHEREFORE,** as compensation for injuries suffered due to SIG's negligence and breaches of its implied and express warranties of merchantability and fitness for a particular purpose, deceptive marketing practices, and negligent and intentional infliction of emotional distress and physical injury, Haynes demands judgment in his favor and against SIG in an amount of no less than THREE MILLION and 00/100 DOLLARS ($3,000,000.00) together with pre-judgment interest, attorneys' fees, and costs.

This 26th day of October, 2020.

WOOD CRAIG & AVERY, LLC

*/s/ Brett A. Miller*
J. Blair Craig
Georgia Bar No. 192850
Brett A. Miller
Georgia Bar No. 142002
Attorneys for Plaintiff

1201 Peachtree Street, N.E.
Suite 1700
Atlanta, GA 30361
P: (404) 888-9962
F: (470) 552-3779
blair@woodcraig.com
brett@woodcraig.com